Dear Mr. Napper:
You requested the opinion of this office concerning several issues which have arisen in connection with the Millennium Trust (the ATrust )and the Louisiana Fund (the AFund ) established in the State Treasurypursuant to Article VII, Sections 10.8 and 10.9, respectively, of theLouisiana Constitution, effective July 1, 2000. Act No. 1295 of the 1999Regular Session enacted enabling legislation with respect to theestablishment of the Trust and of the Fund, R.S. 39:98.1, et seq., withthe same effective date as the constitutional amendment.
 As you noted, these constitutional and statutory provisions provide forthe deposit and credit of certain portions of the Tobacco SettlementRevenues received by the State, after the effective date thereof, to theTrust and to the Fund, and for appropriations from certain portions ofthe investment earnings of the Trust and from the Fund.
 Act No. 1145 of the 2001 Regular Session enacted La.R.S. 39:99.1, etseq., and authorized, among other things, the sale and securitization bythe State of up to sixty percent of the Tobacco Settlement Revenuesreceived as a result of the Master Settlement Agreement, declared thatnet proceeds of any such sale and securitization shall constitute moniesreceived as a result of the Master Settlement Agreement subject to theprovisions of Louisiana Constitution Article VII, Sec. 10.8 and Sec. 10.9,and otherwise further provided for the deposit and credit of any such netproceeds. Pursuant to this authorization, a sale and securitization ofsixty percent of the State's Tobacco Settlement Revenues was effected onNovember 7, 2001, during the State's fiscal year commencing on July 1,2001.
 I. Your first set of questions pertains to La. Const. Art. VII, Sec.10.8(C)(1) which restricts appropriations each year by the Legislaturefrom the three funds created within the Trust as follows in pertinentpart:
 AAppropriations from the Health Excellence Fund, Education Excellence Fund, and TOPS Fund shall be limited to an annual amount not to exceed the estimated aggregate annual earnings from interest, dividends, and realized capital gains on investment of the trust as recognized by the Revenue Estimating Conference. Amounts determined to be available for appropriation shall be those aggregate investment earnings which are in excess of an inflation factor as determined by the Revenue Estimating Conference. The amount of realized capital gains on investment which may be included in the aggregate earnings available for appropriation in any year shall not exceed the aggregate of earnings from interest and dividends for that year. (Emphasis added)
 This provision limits appropriations to an annual amount not to exceedthe estimated aggregate annual earnings from interest, dividends andrealized capital gains on investment of the Trust, which are in excess ofan inflation factor as determined by the Revenue Estimating Conference(the AConference ).
 As you noted, the above quoted provision indicates that each year theremay be investment earnings of the Trust (the inflation factor amount)that are not available for appropriation, and additional investmentearnings (an amount in excess of the amount estimated and appropriated,and an amount of realized capital gains in excess of the cap establishedin the provision) that may potentially be achieved that likewise are notavailable for appropriation. Your questions are:
 With respect to the annual inflation factor amount of earnings, do these automatically become part of the Trust principal, as they are earned or realized, and therefore not available for future appropriation? If not, how should they to be treated and accounted for, and when are they available for appropriation?
 The State Constitution must be interpreted by the same rules as areother laws and, therefore, must be read to accord equal dignity to allits provisions, giving effect to the intent of both the framers and thepeople who adopted it, thereby avoiding absurd and impractical results. Itis a general principle of judicial interpretation that, unlike thefederal constitution, a state constitution's provisions are not grants ofpower but instead are limitations on the otherwise plenary power of thepeople of a state exercised through its legislature. In its exercise ofthe entire legislative power of the state, the legislature may enact anylegislation that the state constitution does not prohibit. Board ofDirectors of the Louisiana Recovery District v. All Taxpayers, et al.,529 So.2d 384 (La. 1988)
 It is the opinion of this office that Article VII, Section 10.8 doesnot address investment earnings which constitutionally are not availablefor appropriation (the inflation factor amount; or, an amount of realizedcapital gains in excess of the cap) and thus there is no authorizationfor these earnings to be appropriated. Accordingly, the only permissibleuse of these earnings is to include them as part of the principal of theTrust. The principal of the Trust is not available for appropriation.[1]
 With respect to any annual amount of earnings that may be achieved in excess of the amount appropriated in a fiscal year, do these become part of the Trust principal, as they are earned or realized or at the end of the fiscal year, and therefore not available for future appropriation? If not, how should they be treated and accounted for, and when are they available for appropriation? If they are available for appropriation in a subsequent fiscal year, is their availability for appropriation subject to any other restrictions or limits?
Appropriations from the Education Excellence Fund are limited toestimated (i) aggregate annual earnings from interest and dividends, and(ii) realized capital gains. A capital gain is the amount by which anasset's selling price exceeds its initial purchase price. A realized capital gain means that the investment has been sold at a profit. Accordingly, actual earnings from interest and dividends and realized capital gains which are in excess of the estimate are not addressed by the Constitution and thus are not available for appropriation and instead become part of the principal of the Trust.
 With respect to any annual amount of earnings, consisting of realized capital gains in excess of the cap established in the constitutional and statutory provisions, that may be achieved in any fiscal year, do these become part of the Trust principal, as they are realized or at the end of the fiscal year, and therefore not available for future appropriation? If not, how should they be treated and accounted for, and when are they available for appropriation? If they are available for appropriation in a subsequent fiscal year, is their availability for appropriation subject to the realized capital gains cap limit for that year or to any other restrictions or limits?
As stated in answer to your first question, it is the opinion of this office that realized capital gains in excess of the cap become part of the Trust principal, as they are realized, and are not available for future appropriation. This conclusion renders the remainder of your questions moot.
 II.
Louisiana Constitution Article VII, Sec. 10.8(A)(1)(d) and (C)(3), and La.R.S. 39:98.1(A)(4) and R.S. 39:98.3(C), provide for certain annual appropriations from the Education Excellence Fund to the Superintendent of Education for distribution to public and private school systems in the State and to certain State schools set out and named therein. Subparagraph (C)(3)(i) of the Constitutional provision provides:
 A The treasurer shall maintain within the state treasury a record of the amounts appropriated and credited for each entity through appropriations authorized in this Subparagraph and which remain in the state treasury. Notwithstanding any other provisions of this constitution to the contrary, such amounts, and investments earning attributable to such amounts, shall remain to the credit of each recipient entity at the close of each fiscal year. (Emphasis added)
La.R.S. 39:98.3.C.(9) contains an identical provision.
 These provisions indicate that certain of these appropriated fundsmay, after appropriation and until, and if, distributed and spent,remain in the Treasury through the end of a fiscal year or yearsto the credit of the Arecipient entity .
 At what point in this procedure do these appropriated funds become the property of the respective recipient entities and no longer Astate funds or a part of the Trust and the Education Excellence Fund? Is this point in the procedure the same for the public and private school systems as well as the named State schools?
 Generally, funds within the state treasury are state owned funds. Thereare some limited exceptions, including certain insurance premiums whichare dedicated to statewide retirement systems, Firefighters RetirementSystem, et al. v. Landrieu, 572 So.2d 1172 (La.App. 1st Cir. 1990); taxespaid under protest which are kept in an escrow account pending resolutionof the dispute, R.S. 47:1576; and, inheritance taxes to which the Statehas an inchoate right until the passage of a specified period of time,Op.Atty.Gen. 85-9.
 It is the opinion of this office that State funds which areappropriated from the State treasury remain State funds until the moniesare physically withdrawn from the State treasury. A legislativeappropriation is only required to withdraw State funds from the Statetreasury. Firefighters Retirement System, et al. v. Landrieu, supra. Anappropriation is an authorization by the legislature to expend from publicfunds a sum of money, for the purpose designated. R.S. 39:2(3). As statedin Henry v. Edwards, 346 So.2d 153 (La. 1977), and quoted with approvalin Louisiana Public Facilities Authority v. Foster, 2001-0009 (La. 9/18/01) 795 So.2d 288:
 [I]nherent in the power of appropriation is the power to specify how the money shall be spent. Therefore, in addition to distinct "items" of appropriation, the legislature may include in an appropriation bill qualifications, conditions, limitations or restrictions on the expenditure of funds . . .
Generally, an entity to whom an appropriation is made obtains an inchoate or incomplete interest in the appropriated monies in the state treasury. It is not until the qualifications, conditions, limitations or restrictions on the expenditure of funds are met, that the money can be withdrawn from the state treasury and expended. Ownership vests in the entity to which the appropriation was made upon the withdrawal or expenditure of the funds, not upon the effective date of the appropriation.
With regards to the Education Excellence Fund, the Constitution makes a distinction between Aappropriations , Aallocations and Adistributions .It is our understanding that an appropriation is an authorization toexpend, while an allocation is a direction as to how the appropriation isto be spent, while a distribution is the actual withdrawal orexpenditure. In this instance, the appropriations are not made directlyto the recipient school and school systems[2], but rather theappropriations are made to the superintendent of education. The recipientschool or school systems must prepare and submit to the State Departmentof Education a prioritized plan for expenditure of funds it expects toreceive in the coming year. Distribution of the funds may occur onlyafter the plan has received both legislative and departmental approval asprovided by law.[3]
It is the opinion of this office that the appropriated funds become the property of the respective recipient entities and are no longer Astatefunds when they are withdrawn from the State treasury upon distributionby the State superintendent of education after approval of the plan bythe department and the legislature. Until that time, the schools andschool systems only have an inchoate or incomplete interest in theappropriated monies in the state treasury. It is not until thequalifications, conditions, limitations or restrictions on theexpenditure of funds are met, namely, the preparation and submission ofthe plan by the recipient entity and the legislative and departmentalapprovals, that ownership transfers. While ownership has not transferred,the monies appropriated for the schools and the school systems cannot bediverted for any other purpose nor to any other entity. The allocationsto the various recipient entities must occur as described in theConstitution. Even though the schools and the school systems do not havefull ownership of the funds available for appropriation from theEducation Excellence Fund while those monies are in the state treasury,the disposition of the funds must follow the allocations set forth in theConstitution and the funds should be held as though in trust for therecipient entities. We believe that even though ownership has nottransferred, it would be appropriate to treat the funds in a custodialcapacity as though owned by the recipient entities. We suggest that itwould not be appropriate to use these monies for cash flow borrowings.
 Also, the monies appropriated for the schools and school systemsremaining in the state treasury earn interest attributable to suchamounts and remain to the credit of each recipient entity as provided inLa. Const. Art. VII, Sec. 10.8(C)(3)(i).
 In order to give effect to the provision of the Constitution whichmandates that investment earnings on the Trust are to be credited to thethree Subfunds[4] as well as the Constitutional provision whichmandates that investment earnings on Education Excellence Fundappropriations remaining in the State treasury remain to the credit ofeach recipient entity, we suggest that upon appropriation to thesuperintendent of education, the monies should remain in the statetreasury yet be removed from the Trust. It is our understanding that youroffice upon appropriation has moved the funds out of the Trust and intoan administrative account. We believe that this is an appropriate courseof conduct.
 As to whether this is the same for the named State schools, we suggestthat the monies appropriated to the named State schools (as listed infootnote 3) remain State funds even when the monies are removed from theTrust upon appropriation to the named State schools. No distinction ismade in the Constitution between the seven named schools and the otherschools and school systems.
 La. Const. Art. III, Sec. 16 provides that appropriations shall not bemade for longer than one year. The language of La. Const. Art. VII, Sec.10.8(C)(3)(i) contains an exception to that provision in that it providesthat notwithstanding any other provisions of the constitution to thecontrary, appropriations from the Education Excellence Fund, andinvestment earnings attributable to such amounts, remain to the credit ofeach recipient entity at the close of each fiscal year. It is the opinionof this office that appropriations from the Education Excellence Fund donot lapse at the end of the fiscal year as do all other appropriations.
 At the point in the procedure when these appropriated funds become the property of the respective recipient entities, should the Treasury separate and segregate these funds from the Trust and the Education Excellence Fund for custody, management and investment purposes? If so, should the funds of the public and private school systems entities be separated and segregated from those of the named State schools entities for custody, management and investment purposes? If the funds should be separated and segregated into a pool or pools, what management and investment guidelines are applicable to the pool or pools for Treasury's management and investment of them while remaining in the Treasury?
 As it is the opinion of this office that the appropriated funds do notbecome the property of the respective recipient entities until actualdisbursement, but they do not remain part of the Trust uponappropriation, it would be appropriate to separate and segregate the fundsfrom the Trust and the Education Excellence Fund for custody, managementand investment purposes. Between the various recipient entities, thefunds should be shown on the accounts of the treasury separately. We donot see any provision, constitutional or statutory, need for the funds ofthe seven named schools to be separated and segregated from the otherrecipient entities for investment purposes.
 As to the management and investment guidelines applicable to theappropriated funds, since the funds are no longer in the Trust, theinvestment authority contained in La. Const. Art. VII, Sec. 10.8(B) nolonger applies and your office should follow the general laws whichpertain to the investment and collateralization of monies in the statetreasury, see in particular, R.S. 49:321, et seq. Your office should actas a custodian to the recipient entities with regards to these funds.
 With respect to such funds appropriated and distributed to the respective public and private school systems entities that may remain in the Treasury beyond the fiscal year in which appropriated, do these funds, and the investment earnings thereon, require an appropriation to be withdrawn from the Treasury by the entities in a subsequent fiscal year? If not, what procedures and authorization should be used for such withdrawals from the Treasury in subsequent fiscal years?
 As we answered in response to a previous question, it is the opinion ofthis office that subsequent appropriations are not necessary even if thefunds remain in the state treasury to the credit of a school or schoolsystem. The funds are subject to constitutional conditions andrequirements which may involve a lengthy period of time in order forcompliance and approval to occur. When the superintendent of educationadvises that a plan has been approved, the procedures and authorizationfor withdrawal of the funds should be in accordance with your traditionalbusiness practices except that the appropriation may have occurred in aprevious fiscal year.
 With respect to such funds appropriated and distributed to the respective State schools entities that may remain in the Treasury beyond the fiscal year in which appropriated, do these funds, and the investment earnings thereon, require an appropriation to be withdrawn from the Treasury by the entities in a subsequent fiscal year? If not, what procedures and authorization should be used for such withdrawals from the Treasury in subsequent fiscal years?
 Subsubparagraph (C)(3)(i) does not make a distinction between therecipient entities, as it states: Asuch amounts . . . shall remain to thecredit of each recipient entity at the close of each fiscal year. (Emphasis added). Accordingly, it is the opinion of this office that the seven named State schools should not be treated differently than any other recipient entity.
 III.
Your third set of questions pertain to La.R.S. 39:99.12.B(3), enacted by Act No. 1145 of the 2001 Regular Session of the Louisiana Legislature, which provides:
 In the event a sale or sales authorized in Subsection A of this Section is made during the state fiscal year commencing on July 1, 2001, the state treasurer, in consultation with the commissioner of administration, shall provide for the deposit into the Louisiana Fund an amount of the net proceeds of any such sale or sales that together with other deposits will ensure that fifty million dollars is deposited into the Louisiana Fund in that state fiscal year. The remainder of such proceeds after deposit into the Louisiana Fund, any residuals received in such state fiscal year and the net proceeds of any sale or sales occurring after that state fiscal year shall be deposited in the Millennium Trust. (Emphasis added)
A sale and securitization of sixty percent of the Tobacco SettlementRevenues of the State under the Master Settlement Agreement occurred onNovember 7, 2001, during the fiscal year commencing on July 1, 2001.
 Do these provisions restrict the total amount of monies deposited to and credited to the Fund, from all sources, the regular Tobacco Settlement Revenue payments received in January and April under the Master Settlement Agreement and the net proceeds received from the sale and securitization in November, to $50,000,000 this fiscal year? Or, do these provisions limit only the amount to be deposited and credited to the Fund from the net proceeds of the sale and securitization to $50,000,000, such that the Fund would receive that amount plus the constitutional percentage amounts from the regular Tobacco Settlement Revenue payments in January and April of this fiscal year?
It is the opinion of this office that the above quoted language does not limit the amount to be deposited into the Louisiana Fund to $50 million but mandates that at least $50 million be deposited into the Louisiana Fund that fiscal year. We emphasize that $50 million was to be deposited into the Louisiana Fund because the Fund had a beginning fund balance of approximately $13 million. However, R.S. 39:99.12.B(3) requires a $50 million deposit during the fiscal year and not a $50 million balance so that the beginning fund balance should not be included in the determination of the amount to be deposited during the fiscal year. It is our understanding, based upon conversations with your office, that at the date of delivery of the bonds, the only deposits into the Louisiana Fund for the fiscal year were investment earnings of several hundred thousand dollars. At the time of the sale, there was an estimate as to the tobacco settlement proceeds to be received by the State during the fiscal year, but there are outside factors which can affect the receipt of such funds. In order to ensure compliance with R.S. 39:99.12(B)(3), your office deposited $50,000,000 from the bond proceeds into the Louisiana Fund. We think your actions in this regard were appropriate.
 If the total amount of monies to be deposited and credited to the Fund from all sources is limited to $50,000,000 this fiscal year, is the proper procedure for the Treasurer and Commissioner to follow to wait until the regular January and April payments of Tobacco Settlement Revenues are received and the constitutional deposits and credits to the Fund are determined and made, and then adjust the amount of the net proceeds from the sale and securitization such that it along with the regular payments amount total $50,000,000, leaving the rest of the net proceed for deposit and credit into the Trust? If not, what are the proper procedures and timing thereof to accomplish this statutorily mandated adjustment?
Because the answer to your previous question was that more than $50,000,000 could be deposited into the Louisiana Fund, we believe your remaining questions are now moot.
Trusting this adequately responds to your request, we remain
Yours very truly,
 RICHARD P. IEYOUB Attorney General
 BY: ________________________________ MARTHA S. HESS Assistant Attorney General
RPI/MSH
DATE RELEASED: May 1, 2003
 MARTHA S. HESS, ASSISTANT ATTORNEY GENERAL
[1] La. Const. Art. VII, Sec. 10.8(C)(1).
[2] An exception to appropriations from the Education Excellence Fund being made to the State superintendent of education for allocation to recipient schools and school systems is found in Subsubparagraph (C)(3)(b) wherein the Constitution directs that appropriations be made to the Louisiana School for the Deaf, the Louisiana School for the Visually Impaired, the Louisiana Special Education Center in Alexandria, the Louisiana School for Math, Science and the Arts, the New Orleans Center for Creative Arts and the Louis Armstrong High School for the Arts, after such schools are operational.
[3] La. Const. Art. VII, Sec. 10.8(C)(3)(g).
[4] The Education Excellence Fund, the Health Excellence Fundand the TOPS Fund.